UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 22-CR-10033-JES-JEH |
| ) | |
| DAZMINE M. ERVING, ) | |
| Defendant. ) | |

## ORDER AND OPINION

This matter is now before the Court on Defendant's Motion (Doc. 15) to Suppress. The United States filed its Response (Doc. 16) in Opposition and the Defendant filed his Reply (Doc. 17). The United States requested an evidentiary hearing which was held on April 20, 2023. Doc. 18. For the following reasons, the Defendant's Motion (Doc. 15) to Suppress is DENIED.

### Background

On September 20, 2022, Defendant Dazmine M. Erving ("Defendant" or "Erving") was indicted on one count of Felon in Possession of a Firearm under 18 U.S.C. §922(g). This charge arises out of a search of a Red Durango that Erving was in by Peoria Police Officer Lieutenant Erin Barisch ("Barisch" or "Lieutenant Barisch") in the early morning hours on September 14, 2022. Erving moves to suppress the evidence obtained during that encounter on the grounds that Barisch's search of the car Erving was in violated the Fourth Amendment.

 On April 20, 2023, the Court held an evidentiary hearing at the United States' request. The United States' called Lieutenant Barisch as a witness and he testified about the events leading up to the challenged search. The United States submitted as additional evidence several photos of signs posted around the park showing park rules, a GPS picture with additions to show where in the park the encounter occurred, and the footage and still excerpts from Lieutenant Barisch's body-worn camera from that night. Defendant cross-examined Barisch and called no other witnesses. The Defendant introduced into evidence a complete copy of the ordinance and

1

rules for the park. The following facts are taken from the evidence presented at the April 20, 2023 hearing.

In the early morning hours of September 14, 2022, at approximately 2:44 am, Lieutenant Barisch was on patrol in an unmarked police squad car patrolling an area which included the River Front Park on Morton Street in Peoria. As he was patrolling the area, he saw a Red Dodge Durango SUV backed into a parking spot in an otherwise vacant parking lot in the park. The Park was closed to the park at this time and the area was dark and not illuminated with any artificial lighting. Barisch drove towards the Durango and parked his police car roughly two car-lengths away. His headlights illuminated the ground area in front of the Durango, and he pointed the spotlight affixed on his car directly into the driver's side window of the vehicle. The light from the spotlight shone through the Durango's driver's side window and partially illuminated the interior of the vehicle. The vehicle's rear windows and rear trunk window were heavily tinted and the front windows and windshield were not tinted. Lieutenant Barisch used his handheld flashlight to further illuminate the vehicle.

Barisch exited his police car and activated his body-worn camera as he approached the Durango. He was able to see two people in the backseat of the car; one woman in the rear passenger seat and what he believed was a man sitting in the rear driver's side seat. The passengers were partially clothed. Barisch testified that as he approached, he saw both passengers make quick movements. He took specific note of one movement by the male passenger: quickly leaning down and then toward the rear of the back driver's seat toward the floorboard, and then quickly sitting back up. Barisch testified that he believed this motion could have been an attempt to conceal a firearm or contraband under the driver's seat. Barisch indicated in his report and in his testimony that he suspected that the passengers may have been

attempting to have sex, due to their being in the backseat of the car, in the park after dark , and their state of undress.

Barisch reached the rear passenger door and Barisch or the male passenger opened it and the male passenger put his hands up in the air. At this time, Barisch smelled the odor of burnt cannabis. He testified that he did not observe any other indicia of cannabis use at that point or subsequently, such as clouds of smoke, cannabis residue, or drug paraphernalia. The male passenger identified himself as Dazmine Erving and produced identification upon request. The female passenger identified herself initially as Adrianna Smith[1] but told Barisch that she had an Illinois driver's license but had left it at home. When asked for her date of birth, the female passenger told Barisch that it was 2/5/2005, which would have made her 17 at the time of the stop.

Lieutenant Barisch returned to his squad car to look up Erving and the female passenger in the law enforcement database LEADS. LEADS revealed that Erving was on federal supervised release for weapon offenses. When he entered the female passenger's given name and date of birth, LEADS returned "No Record on File." As she said she had a driver's license, the LEADS check should have returned a positive result and so Lieutenant Barisch concluded that she'd either given him a false name or false date of birth. Barisch returned to the Durango and asked Erving if he was on federal supervised release. Erving answered truthfully that he was and, upon further questioning, told Barisch that it was for weapons offenses and gave the name of his probation officer. Throughout the encounter, Erving had a calm and even demeanor and complied with Lieutenant Barisch's requests. Barisch asked Erving if there were any weapons in the car and Erving said there were not.

---

[1] She subsequently told officers that this was a fake name.

Barisch then told Erving and Smith to exit the vehicle and they did so. Erving asked if he could retrieve his shoes from the front seat and put them on, which Barisch allowed him to do. Barisch asked them to step to the rear of the vehicle and once there asked them to instead go to the front of the vehicle. As Erving and Smith walked to the front of the vehicle, Barisch took the opportunity to investigate the driver's seat area that he'd become suspicious of from Erving's earlier furtive movement. He leaned down and shined his handheld flashlight under the seat toward the rear and saw the barrel of a handgun. At this time, Lieutenant Barisch requested backup and arrested Erving. The firearm was retrieved from under the driver's seat and forms the factual basis of the charges Erving is facing in this case.

## DISCUSSION

Erving seeks to suppress the handgun that was found in the Durango and his subsequent statements on the grounds that Lieutenant Barisch's search of the car violate the Fourth Amendment. We begin with the well-settled proposition that the warrantless searches are per se unreasonable unless they fit within a well-recognized exception to the warrant requirement. *U.S. v. Thurman*, 889 F.3d 356, 365 (7th Cir. 2018). The United States argues that two exceptions applied to Lieutenant Barisch's search: the 'automobile' exception and a protective search under *Michigan v. Long*, 463 U.S. 1032 (1983).

<u>Automobile Exception</u>

The United States argues that Lieutenant Barisch's testimony that he smelled cannabis provided probable cause to search the vehicle. They direct us to several cases where the Seventh Circuit that have held that the odor of cannabis alone is probable cause to search a vehicle. *See United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) ("A police officer who smells marijuana from a car has probable cause to search that car.") (citing *United States v. Wimbush*,

336 F.3d 947, 951 (7th Cir. 2003)); *see also United States v. Kizart*, 967 F.3d 693 (7th Cir. 2020) (odor of burnt cannabis after traffic stop for speeding provided probable cause to search vehicle). However, each of these cases involves searches that occurred prior to the legalization of cannabis in Illinois.[2] There is a split in the Illinois appellate courts about what effect legalization has had on searches based on the odor of cannabis. *Compare People v. Stribling*, 2022 IL App (3d) 210098 ¶29 (Ill. App. 3d 2022) ("[T]he smell of the burnt cannabis, without any corroborating factors, is not enough to establish probable cause to search the vehicle") *with People v. Molina*, 2022 IL App (4th) 220152 (Ill. App. 4th 2022) (reaching the opposite conclusion for the odor of unburnt or raw cannabis).[3] This ambiguity has been recognized by other district courts in the Illinois,[4] and the Illinois Supreme Court has granted leave to appeal to resolve the issue under Illinois law. *See People v. Molina*, 2023 WL 2751668 (Ill. 2023) (granting petition for leave to appeal and consolidating case with *People v. Redmond*, 2023 WL 2749120 (Ill. 2023)).

The Court asked the parties at argument what relevance, if any, it has that cannabis remains illegal as a matter of federal law. The Defendant argued that because Lieutenant Barisch was a local police officer empowered to investigate state and local laws, not federal, and therefore the federal criminalization of cannabis should not play a role in our analysis. The United States stated that it was not certain what effect it should have, but that the search was still justifiable under Illinois law as well as local ordinances prohibiting smoking cannabis in the park.

---

[2] While *Kizart* was decided on July 28, 2020, after legalization, the underlying traffic stop and search occurred pre-legalization in 2017. Brief for Appellee at 7, *United States v. Kizart*, 967 F.3d 693 (7th Cir. 2020); Cannabis Regulation and Tax Act, 410 ILCS 705/1-1 *et seq.* (legalizing possession of small amounts of cannabis on January 1, 2020).
[3] The United States incorrectly characterized these as unpublished opinions in their briefing and argument. Both *Stribling* and *Molina* are published decisions of the Illinois Courts of Appeals, as indicated by the lack of a U in their public domain designation. *See* Ill. Sup. Ct. Rule 23.
[4] *United States v. Griffin*, 023 WL 2266046 at *4 n.6 (N.D. Ill. Feb. 28, 2023).

Ultimately, the Court need not resolve this foggy issue as we find the stop constitutional under *Long*.

Protective Sweep of a Vehicle under *Long*

In *Long*, the Supreme Court held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049-50. "*Long* searches are grounded in concern for officer safety,[] so if that concern is not present, *Long* does not justify the search." *U.S. v. Vacarro*, 915 F.3d 431, 436 (7th Cir. 2019) (citing *Arizona v. Gant*, 556 U.S. 332, 338-39 (2009)). The parties dispute whether Lieutenant Barisch could reasonably suspect that Erving was armed and dangerous.

The United States argues that the furtive movement that Lieutenant Barisch observed Erving make downwards as he approached the vehicle was an adequate basis for the search. Lieutenant Barisch testified that, based on his experience as a law enforcement officer, he believed that this movement downwards towards the floor of the Durango was consistent with Erving attempting to hide a firearm. The United States directs us to several cases that held that they contend hold that furtive movements alone can be sufficient to form the reasonable suspicion required under *Long*. *See Vaccaro*, 915 F.3d at 436-37; *U.S. v. Evans*, 994 F.2d 317, 321-22 (7th Cir. 1993). In *Evans*, a driver leaned his body forward prior to a traffic stop and the officers inferred that he was reaching under the seat to place or retrieve something. *Id.* In *Vaccaro*, a driver made two movements prior to a traffic stop, one bending at the waist and another leaning back into the back seat of the vehicle, which the officers interpreted as either

hiding or retrieving weapons. *Vaccaro*, 915 F.3d at 434. In both cases, the Seventh Circuit held that the officers upheld the searches under *Long* based in part on the furtive movements.

Defendant argues that each of these cases is readily distinguishable. They note that *Evans* occurred in a high crime area and the defendants had voluntarily stopped in front of a "reputed distribution point for drugs" which the court found supported the reasonableness of officers' safety concerns. *Evans*, 994 F.2d at 321. Defendant seeks to distinguishes *Vaccaro* on the grounds that the movements in that case were described as a "vey ferocious move by bending at the waist" followed by a second "aggressive move with [the defendant's] entire top torso and both arms into the back seat of the vehicle." *Vaccaro*, 915 F.3d at 434.[5] The Court finds that these differences are not enough to distinguish *Evans* and *Vaccaro* from the case at hand, especially given the additional information that Barisch learned during his investigation as discussed below. Assuming that Defendant reading is correct and *Vaccaro* and *Evans* require furtive movements plus other facts that support the officer's reasonable suspicion, that was satisfied here.

In addition to these factual differences, Defendant argues that any reasonable suspicion was undermined by the likely innocent explanation for any movements- namely, that he was undressed and trying to get dressed quickly. Lieutenant Barisch's initial report indicated that as he approached the vehicle, he suspected that Erving and the woman in the car were in the park to have sex. This was based on their relative states of undress, their presence in the park after hours, their being in the back seat of the vehicle and not the front, and his law enforcement experience indicating that couples would sometimes use the park after hours as a hookup spot. Defendant

---

[5] Defendant also seeks to distinguish *Vaccaro* based on the fact that the officers in *Vaccaro* claimed to see a rifle case in the defendant's car before the search. While that is true, both the District Court and the Seventh Circuit both held that their testimony on that point was not creditable and so is not an important distinction for this case. *Vaccaro*, 915 F.3d at 434-35.

argues that any movement that Lieutenant Barisch observed was consistent with his efforts to get dressed and that this innocent explanation undercuts the basis for Barisch's suspicion. The Defendant also challenges Lieutenant Barisch's ability to observe the movement in question. It was dark out, there was no lighting save the headlights and spotlight form Barisch's squad car and his own flashlight. The rear windows in the Durango were semi-tinted and his view through the front would have been partially obscured by the headrests. Defendant also notes that Barisch testified that the other person in the car was a female but said he believed Erving was a male as he approached.

When there is a proffered innocent explanation for a defendant's conduct, an officer is not required "to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018). The probable cause and reasonable suspicion inquiries are based on what a reasonable officer "could conclude- considering all of the surrounding circumstances, including the plausibility of the [innocent] explanation itself." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 244 n. 13 (1983)). While he did not discount his comments in his police report that Erving and the woman may have been having or about to begin having sex, he testified that the movement he observed was not consistent with getting dressed. He described it as a "quick movement leaning down and then quickly back up." When asked if this movement could have been to pull up his pants or otherwise get dressed, he stated that in his experience "the movements of trying to get dressed would have been significantly longer and different…. if he had his pants down, the movement wouldn't have been leaning down; it would have been trying to pull up, and he would have had to lean back to pull his pants up over his knees, up his thighs and up over his butt" and that would have been more of an "up-and-leaning back movement."

The Court finds Lieutenant Barisch's testimony that he saw the movement credible and that it was a reasonable inference that Erving's movement was for the purpose of hiding something. While it was dark out, the car was lit through the untinted windshield and front windows by a spotlight, his headlights, and his flashlight. His testimony that he observed the movements in question is bolstered by the manner he carried out the search. He testified that he observed Erving in the backseat make a downward motion towards the floor of the vehicle. After asking Erving and the woman to exit the vehicle, the first place that he looked was under the driver's seat and just by shining his flashlight under the driver's seat he was able to see the barrel of the gun. He looked at this one location rather than conducting a full search of the vehicle or the more obvious locations and this is consistent with his testimony that he focused in on the area under the driver's seat because of Erving's motion. Of the two interpretations of Erving's movements -the defense's preferred interpretation that he was dressing himself quickly to be presentable when Barisch arrived, or the United States' that he was hiding something- the second was a reasonable inference from the facts that Barisch knew at the time of the search. The alternative proposed by the Defendant does not make unreasonable Barisch's conclusion that a quick motion to put something under the seat as a police officer approached could be used to hide a weapon or contraband.

Lieutenant Barisch's suspicion that Erving was armed and dangerous was bolstered by what he learned during his investigation. After asking Erving and the woman in the car for their names and identification, Barisch looked them up in the law enforcement database LEADS. In doing so, he learned that Erving was on federal supervised release. When he returned to the car, Barisch asked Erving who confirmed this and he told Barisch that he was on supervised release for weapons offences, for possession of a firearm. A "law enforcement officer's knowledge if a

suspect's criminal history may support the existence of reasonable suspicion" when it is coupled with additional facts. *U.S. v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005). Based on the "No Records on File" result for the information the woman gave him, that she was either lying about her date of birth or her name. Barisch's suspicion that Erving had hidden something under the driver's seat, combined with him being on federal supervised release for weapons history and the false information provided by the woman was an adequate basis for reasonable suspicion.

The Defendant argues that any inference of dangerousness was undercut by the fact that Lieutenant Barisch allowed Erving and the woman considerable freedom of movement during the stop. He notes that Barisch allowed the woman to go into the front area of the vehicle and retrieve items from the glove compartment, allowed her to take her purse with her when she left the vehicle, and subsequently let her call her mother. The Court notes that some of this occurred after the search, and is therefore of limited relevance to this inquiry. To the extent it has any relevance on whether Barisch could have reasonably suspected that Erving was armed, Barisch testified that after he confirmed where the weapon was, he was unconcerned about Erving and the woman's movements that were not near the weapon.

The second prong of "*Long* inquiry requires the government to establish that the officers reasonably suspected that [Erving] could gain immediate control of weapons in the vehicle." *Vaccaro*, 915 F.3d at 437 (internal quotations suppressed). This is easily satisfied here. It is undisputed that Erving and the woman's presence in the park afterhours was nothing more than an ordinance violation punishable on the first offense by a $50 fine. Lieutenant Barisch had no other basis to arrest Erving so he would have gained access to the weapon as soon as Barisch finished writing a citation.

The facts of this case are a close call but the Court finds that the furtive movement that Lieutenant Barisch observed combined with the knowledge that Erving was on federal supervised release for weapons offences, that his female companion was lying about her age or name, and the smell of burnt cannabis was an adequate basis for reasonable suspicion under *Vaccaro* and *Evans*. A reasonable officer could conclude from these facts that Erving had hidden a weapon under the driver's seat and was therefore armed and dangerous and could have gained access to the weapon if released. As such, Lieutenant Barisch's search was not in violation of the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion (Doc. 15) to Suppress is DENIED.

Signed on this 24th day of April, 2023,

        s/ James E. Shadid_____
        James E. Shadid
        United States District Judge